

FILED

2021 Sep-13  PM 08:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| Michelle Beasley, Lindsey Warren, Rebecca Kennedy, and Cheryl Michaels, individually and on behalf of all those similarly situated teachers employed by the Tuscaloosa County School System, | ) ) ) ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO.: 7:21-cv-890-LSC** |
| | ) | |
| **vs.** | ) | **CLASS ACTION** |
| | ) | |
| **TUSCALOOSA COUNTY SCHOOL SYSTEM; THE TUSCALOOSA COUNTY BOARD OF EDUCATION; DR. KERI JOHNSON, in her individual capacity; CHARLES ORR, in his individual capacity; PORTIA JONES, in her individual capacity; JOE CALVIN, in his individual capacity; BILL SQUIRES, in his individual capacity; RANDY SMALLEY, in his individual capacity; JAMIE LAKE, in his individual capacity; and DON PRESLEY, in his individual capacity;** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Michelle Beasley, Lindsey Warren, Rebecca Kennedy, and Cheryl

Michaels, individually and on behalf of similarly situated teachers employed by the

Tuscaloosa County School System and the Tuscaloosa County Board of Education, file this First Amended Complaint[1] against Defendants Tuscaloosa County School System; the Tuscaloosa County Board of Education; Dr. Keri Johnson, individually, Charles Orr, individually; Portia Jones, individually; Joe Calvin, individually; Bill Squires, individually; Randy Smalley, individually; Jamie Lake, individually; and Don Presley, individually, and state as follows:

## PARTIES

1.      Plaintiff Michelle Beasley is a full-time, certified teacher employed by the Tuscaloosa County Board of Education.   Mrs. Beasley has been an employee of the Tuscaloosa County Board of Education for thirty-two years and has been an employee of the Tuscaloosa County Board of Education at all times relevant to this action.  Mrs. Beasley is a resident of Tuscaloosa County, Alabama.

2.      Plaintiff Lindsey Warren is a full-time, certified teacher employed by the Tuscaloosa County Board of Education.   Mrs. Warren has been an employee of the Tuscaloosa County Board of Education for ten years and has been an employee of the Tuscaloosa County Board of Education at all times relevant to this action. Mrs. Warren is a resident of Tuscaloosa County, Alabama.

3.      Plaintiff Rebecca Kennedy is a full-time, certified teacher employed by the Tuscaloosa County Board of Education.   Ms. Kennedy has been an employee of

---

[1] Plaintiffs are filing this Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B).

the Tuscaloosa County Board of Education for seven years and has been an employee of the Tuscaloosa County Board of Education at all times relevant to this action.  Ms. Kennedy is a resident of Tuscaloosa County, Alabama.

4.    Plaintiff Cheryl Michaels is a full-time, certified teacher employed by the Tuscaloosa County Board of Education.   Mrs. Michaels has been an employee of the Tuscaloosa County Board of Education for sixteen years and has been an employee of the Tuscaloosa County Board of Education at all times relevant to this action.  Mrs. Michaels is a resident of Tuscaloosa County, Alabama.

5.    Defendant Tuscaloosa County School System ("TCSS"), is a public education system in the State of Alabama that is governed by the Tuscaloosa County Board of Education and provides elementary and secondary education to students in Tuscaloosa County, Alabama.

6.    Defendant Tuscaloosa County Board of Education ("the Board"), is a governmental entity that superintends elementary and secondary education in Tuscaloosa County Alabama.  The Board is an entity that is subject to the provisions of Section 16-24B-1, et seq., of the Code of Alabama (1975).  Defendant Tuscaloosa County Board of Education (the "Board") is the entity responsible for the hiring, firing, promotion, demotion, transfer, assignment, and compensation, as well as all other aspects of employment of personnel, including teachers within the Tuscaloosa County School System.

7.    Defendant Dr. Keri Johnson is Superintendent of the Tuscaloosa County School System. Johnson is sued in her individual capacity.

8.    Defendant Portia Jones is a member of the Tuscaloosa County Board of Education.  She is a resident of Tuscaloosa County, Alabama. Jones is sued in her individual capacity.

9.    Defendant Jamie Lake is a member of the Tuscaloosa County Board of Education.  He is a resident of Tuscaloosa County, Alabama.  Lake is sued in his individual capacity.

10.    Defendant Joe Calvin is a member of the Tuscaloosa County Board of Education.  He is a resident of Tuscaloosa County, Alabama.  Calvin is sued in his individual capacity.

11.    Defendant Don Presley is a member of the Tuscaloosa County Board of Education.  He is a resident of Tuscaloosa County, Alabama.  Presley is sued in his individual capacity.

12.    Defendant Charles Orr is a member and the president of the Tuscaloosa County Board of Education.  He is a resident of Tuscaloosa County, Alabama.  Orr is sued in his individual capacity.

13.    Defendant Randy Smalley is a member and vice-president of the Tuscaloosa County Board of Education.  He is a resident of Tuscaloosa County, Alabama.  Smalley is sued in his individual capacity.

14.    Defendant Bill Squires is a member of the Tuscaloosa County Board of Education.  He is a resident of Tuscaloosa County, Alabama.  Squires is sued in his individual capacity.

15.    Jones, Lake, Calvin, Presley, Orr, Smalley, and Squires shall be referred to collectively as the "Board Members."

## JURISDICTION

16.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs allege a claim arising under a federal law, namely 42 U.S.C. § 1983 and 42 U.S.C. § 2000.

17.    The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because those state law claims share a common nucleus of operative facts with Plaintiffs' § 1983 and Title VII claims.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiffs and Defendants are residents of or are located in Tuscaloosa County, Alabama, and the acts and occurrences giving rise to Plaintiffs' claims occurred in Tuscaloosa County, Alabama, which is in the Western Division of the Northern District of Alabama.

## CONDITIONS PRECEDENT

19.    Plaintiffs bring this action for the unlawful practices and acts of discrimination which had a disparate impact on Plaintiffs and other female teachers in the TCSS.

20.    On December 15, 2020, Beasley filed a charge with the Equal Employment Opportunity Commission ("EEOC") against the Tuscaloosa County School System, the Tuscaloosa County Board of Education, and Dr. Keri Johnson, alleging discrimination based upon her gender and age.  This charge was filed within 180 days of the commission of the unlawful practice alleged in this claim.  (A copy of this charge is attached hereto as Exhibit 1.)

21.    The EEOC formalized Beasley's charge against TCSS, the Board, and Dr. Johnson as Charge No. 420-2021-00634.

22.    Beasley amended her charge with the EEOC on February 18, 2021.  (A copy of the amended charged is attached hereto as Exhibit 2.)

23.    After the Defendants refused mediation, the EEOC issued a "Dismissal and Notice of Rights" dated March 31, 2021 for Beasley's case. (A copy of this Notice of Rights is attached hereto as Exhibit 3.)

24.    Beasley has filed this action within 90 days of receiving the Notice of Rights.

25.     Beasley meets all administrative requirements for filing suit on her Title VII claims and timely brings this action.

26.     On May 5. 2021, Michaels filed a charge with the Equal Employment Opportunity Commission ("EEOC") against the Tuscaloosa County School System, the Tuscaloosa County Board of Education, and Dr. Keri Johnson, alleging discrimination based upon her gender. This charge was filed within 180 days of the commission of the unlawful practice alleged in this claim.  (A copy of this charge is attached hereto as Exhibit 4.)

27.     The EEOC formalized Michaels's charge against TCSS, the Board, and Dr. Johnson as Charge No.420-2021-01774.

28.     On June 29, 2021, TCSS filed a Position Statement in response to Michaels' Charge.

29.     On July 22, 2021, Michaels filed her Response to TCSS's position statement.

30.     To date, EEOC has not provided any further finding for Michaels' charge and EEOC has not issued a "Right to Sue" letter.

31.     On February 19, 2021, Warren filed a charge with the Equal Employment Opportunity Commission ("EEOC") against the Tuscaloosa County School System, the Tuscaloosa County Board of Education, and Dr. Keri Johnson, alleging discrimination based upon her gender.  This charge was filed within 180

days of the commission of the unlawful practice alleged in this claim.  (A copy of this charge is attached hereto as Exhibit 5.)

32.     The EEOC formalized Warren's charge against TCSS, the Board, and Dr. Johnson as Charge No. 420-2021-01191.

33.     On April 9, 2021, TCSS filed a Position Statement in response to Warren's Charge.

34.     On May 3, 2021, Warren filed her Response to TCSS's Position Statement.

35.     On September 1, 2021, having had more than 180 days elapse since her original filing of her Charge, Warren requested a "Right to Sue" letter.

36.     On September 3, 2021, the EEOC issued its notice that her charge had been transferred to the United States Department of Justice, ("DOJ"), and Warren is expecting to receive a Notice of Right to Sue from the DOJ.

37.     On February 7. 2021, Kennedy filed a charge with the Equal Employment Opportunity Commission ("EEOC") against the Tuscaloosa County School System, the Tuscaloosa County Board of Education, and Dr. Keri Johnson, alleging discrimination based upon her gender.  This charge was filed within 180 days of the commission of the unlawful practice alleged in this claim.  (A copy of this charge is attached hereto as Exhibit 6.)

38.     The EEOC formalized Kennedy's charge against TCSS, the Board, and Dr. Johnson as Charge No. 420-2021-01151

39.     On April 8, 2021, TCSS filed a Position Statement in response to Kennedy's Charge.

40.     On September 1, 2021, more than 180 days after Kennedy's initial charge filing, Kennedy requested that the EEOC issue a "Right to Sue" letter.

41.     On September 8, 2021, Kennedy received the EEOC's Closure Notice and Right to Sue Letter. (A copy of the Notice of Rights is attached hereto as Exhibit 7).

42.     Kennedy has filed this action within 90 days of receiving the Notice and Right

43.     Kennedy meets all administrative requirements for filing suit on her Title VII claims and timely brings this action.

## **FACTUAL BACKGROUND**

44.     TCSS employs approximately 1,220 teachers to teach approximately 18,000 students.

45.     Females comprise the significant majority of the certified teachers in the Tuscaloosa County Schools.

46.     Women "are still taking on most of the household and familial duties," including childcare, and "women are also much more likely to be the ones who care

for sick or elderly family members." Maggie Germano, *Women are Working More Than Ever, But They Still Take On Most Household Responsibilities*, Forbes (March 27, 2019), https://www.forbes.com/sites/maggiegermano/2019/03/27/women-are-working-more-than-ever-but-they-still-take-on-most-household-responsibilities.

47.    "Women are eight times more likely than men to look after sick children or manage their children's schedules." *Id*.

48.    In addition, "[t]wo out of every three caregivers in the United States are women." *Women, Caregiving, and COVID-19*, Centers for Disease Control, June 21, 2021, https://www.cdc.gov/women/caregivers-covid-19/index.html.

49.    Approximately 61% of caregivers for adults are women. *See* AARP & NAT'L ALLIANCE FOR CAREGIVING, CAREGIVING IN THE UNITED STATES (2020), https://www.aarp.org/content/dam/aarp/ppi/2020/05/full-report-caregiving-in-the-united-states.doi.10.26419-2Fppi.00103.001.pdf; Ashley Huntsberry-Lett, *Caregiver Statistics: Facts about Family Caregivers*, March 29, 2021, https://www.agingcare.com/articles/who-are-family-caregivers-459287.htm.

50.    Indeed, "upwards of 75% of all caregivers are female, and may spend as much as 50% more time providing care than males." FAMILY CAREGIVER ALLIANCE, CAREGIVER STATISTICS: DEMOGRAPHICS (2016), https://www.caregiver.org/resource/caregiver-statistics-demographics/#.

51.    "Women make up 75 percent of all caregivers," and "women report spending as much as 50 percent more time providing care than men," including, on average, spending "68 hours a week providing childcare."  Devan McGuinness, *Women Spend 50 Percent More Time Providing Care Than Men*, June 7, 2021, https://www.fatherly.com/news/study-caregiving-men-women/.

52.    Beasley is a female and serves as the principal caregiver for her elderly mother. During the 2020-2021 school year, Beasley taught mathematics at Hillcrest High School.

53.    Michaels is a female. During the 2020-2021 school year, Michaels taught 7th and 8th grade mathematics at Echols Middle Elementary School.

54.    Warren is a female and serves as a caregiver for young children. During the 2020-2021 school year, Warren taught 8th grade English at Duncanville Middle School.

55.    Kennedy is a female and serves as a caregiver for her elderly mother and grandparents. During the 2020-2021 school year, Kennedy taught 4th grade at Holt Elementary School.

56.    Under Alabama law, TCSS is under the control and direction of the Board, which is comprised of seven members, each representing a distinct area of Tuscaloosa County, Alabama.  The Board establishes policies for the operation of TCSS and appoints and employs a Superintendent of Schools to make

recommendations to the Board and manage the day- to-day operations and affairs of TCSS.

57.     According to the Board's Policy 6.11, teachers are generally required to be on duty from 15 minutes before school opens until 15 minutes after the close of the school day, Monday through Friday.

58.     Plaintiffs and the members of the classes they represent teach a full day of in-person classes to their students and did so during the 2020-2021 school year.

59.     Historically, high school teachers at Hillcrest have taught students for six class periods each day and had one to two planning or collaboration periods. They also had a lunch break for approximately twenty-five minutes.

60.     Historically, middle school teachers in TCSS had seven periods in a day, and they taught students in five of the periods. The two other periods were devoted to planning and meetings.

61.     Historically, elementary school teachers have taught five subjects— reading, writing, math, social studies, and science—to the same class of students each day and had one planning period.

62.     Other than during their planning period(s) and lunch break (for high school teachers), teachers have students in their classrooms ("On-Campus Students") each day school is in session.

63.     For the 2020-2021 school year in response to the COVID-19 pandemic, students in TCSS had the option to be either (a) an On-Campus Student taking classes in the classrooms at their respective schools; or (b) a Virtual Student and take classes virtually/on-line.

64.     Unlike the vast majority of the other school systems in the State of Alabama, Defendants did not (a) divide the Virtual Students and On-Campus Students between the teachers, assigning certain teachers to teach Virtual Students and certain teachers to teach On-Campus Students, or (b) reduce the number of in-person instructional days to provide the teachers time to prepare and teach the Virtual Students' classes, if the same teachers had to teach both Virtual Students and On-Campus Students.

65.     TCSS teachers, including Plaintiffs, had to use an online learning platform called "Schoology" to teach the Virtual Students.

66.     In June of 2020, the Board approved the use of the Schoology platform to teach Virtual Students, but the Board's vote to approve the use of Schoology did not include a vote on how and when teachers would be required to teach using Schoology. Instead, Johnson instituted her own plan for having the teachers use Schoology to teach the Virtual Students without presenting it to the Board for approval.

67.    Schoology allows teachers to create assignments and lessons through the platform, and while some aspects of Schoology may be beneficial for online learning, the reality is that teachers often have to create new and different assignments and tests for Schoology than for traditional in-person teaching.

68.    For example, Schoology allows a teacher to create a quiz on the platform that allows a student to read the question, answer the question, and then, at the end of the quiz, receive a grade. However, to utilize this function, a teacher has to create the quiz within Schoology.

69.    As a result, teachers have to spend significantly more time creating assignments for On-Campus Students *and* Virtual Students. Even if the assignments cover the same material, the students are receiving the assignments in different ways that require different planning and preparation.

70.    Teaching On-Campus Students and Virtual Students the same subject matter often requires making different tests and quizzes. Because On-Campus and Virtual Students take tests at different times, the risk of students cheating by sharing questions and answers increases. To lessen the risk of cheating, teachers need to create multiple different tests and quizzes for Virtual Students.

71.    Additionally, TCSS instructed teachers to give all students a chance to make up a missed test or assignment.  Therefore, if a teacher had already shared the answers to a certain test or assignment, she would have to make an entirely *new* test

or assignment for any Virtual Student who had not yet completed that particular test or assignment.

72.    Virtual Students also have the ability to ask, and did ask, teachers questions, and teachers had to spend time either sending responses to the Virtual Students or calling them on the phone.

73.    In addition to preparing the separate lesson plans, creating the Schoology-specific content, including various documents for each lesson, and uploading the lessons, TCSS teachers had to (a) teach the Virtual Students how to actually use the Schoology programs; (b) teach the Virtual Students how to memorialize their work and upload it to Schoology (many times Plaintiffs and other TCSS teachers  would receive barely legible photos of a student's work); and (c) answer numerous emails and messages from Virtual Students and their parents (collectively amounting to hundreds of emails a week).

74.    Often, during the 2020-2021 school year, teachers had to devote significant amounts of time overcoming technological barriers and helping students understand how to use Schoology.

75.    The planning and preparation for teaching the Virtual Students were just as extensive and time-consuming as planning for the On-Campus Students. Therefore, Johnson's Virtual Student plan, which did not have Board approval, substantially increased the workload of Plaintiffs and other teachers.

76.     Schoology recommended to the Defendants that the teachers undergo at least three months of training in order for the teachers to be effective with Schoology (and nine months for best results). However, despite the suggested training period, Defendants delayed and failed to timely purchase Schoology until June of 2020.

77.     Defendants claimed to have provided Plaintiffs and members of the Teachers Class with access to train on Schoology.  In truth, however, Defendants only provided Plaintiffs and the Teachers Class members with access to Schoology approximately one week prior to the start of the 2020-2021 school year.

78.     Moreover, the actual training on Schoology consisted of instruction by peer trainers.  These "peer trainers" were teacher representatives from each school in TCSS, who, themselves, each received one day of training from Schoology professionals, and were then, in turn, expected and assigned to train the rest of the teachers at their respective schools on the Schoology platform.  Therefore, Plaintiffs and other TCSS teachers received insufficient, if any, Schoology training before being required by Defendants to teach Virtual Students on the Schoology platform.

79.     As a result of Defendants' poor planning, and lack of provision for training, as well as the inherent complexity, problems, issues, and idiosyncrasies of Schoology, Plaintiffs and other TCSS teachers had to spend many hours of their own

time, outside of their normal working hours, to familiarize, learn, and become proficient with the Schoology platform.

### First Nine Weeks of 2020-2021 School Year

80.   During the first nine weeks of the 2020-2021 school year, Virtual Students took classes exclusively through Schoology, and all of the lessons were prepared by TCSS teachers who taught virtual classes in addition to their normal in-person classes with On-Campus Students.

81.   In other words, teachers taught their typical classes at school, and they were also required to teach virtual classes for Virtual Students through Schoology.

82.   The virtual classes substantially increased Plaintiffs' workload because they were effectively adding another class period for each virtual class taught.

83.   The additional work and the extensive extra hours spent preparing, teaching and grading Virtual Student classes were extremely stressful and exhausting and interfered with the duties of Plaintiffs and other TCSS teachers as family caregivers. The extra hours also negatively impacted teachers' mental, physical and emotional health and deprived them of time with their families and downtime.

84.   The only way teachers could effectively do their jobs and provide adequate instruction to both On-Campus and Virtual Students was to work substantially longer hours after normal school hours.

85.   During the first nine weeks, Beasley's day included the following:

    a.  Teaching six in-person high school classes to On-Campus Students every day of the school week, consisting of Precalculus and Honors Precalculus classes;

    b.  Teaching virtual high school Precalculus and Honors Precalculus classes;

    c.  Planning during a single 50-minute planning period;

    d.  Creating assignments for On-Campus Students;

    e.  Creating assignments for Virtual Students taking Precalculus;

    f.  Creating assignments for Virtual Students taking Honors Precalculus;

    g.  Communicating with and answering questions from Virtual Students and their parents; and

    h.  Learning to use the Schoology platform.

86.   Beasley had approximately 80 On-Campus Students and 86 Virtual Students.

87.   At times during the 2020-2021 school year, Beasley devoted 20–30 hours more per week to her teaching responsibilities as compared to prior years because of the demands placed on her to teach both a full load of in-person classes and virtual classes.

88.     In prior years, Beasley would typically arrive to school around 7:30 AM, leave between 3:30–4:00 PM, and have only minimal, if any, work to perform at home.

89.     Beasley is a caregiver for her elderly mother, and she spends approximately 10 hours a week providing care for her mother.

90.     During the first nine weeks, Warren's day included the following:

     a.  Teaching five in-person middle school Language Arts classes to On-Campus students;

     b.  Having two periods for planning, meetings, and intervention (tutoring students who were behind).

     c.  Creating assignments for On-Campus students;

     d.  Creating assignments for Virtual Students;

     e.  Teaching five middle school Language Arts virtual classes to Virtual Students;

     f.  Responding to, typically, 20-30 messages on Schoology from students; and

     g.  Learning to use the Schoology platform.

91.     Warren had approximately 15–30 On-Campus Students per class and 2–10 Virtual Students per class.

92.     In prior years, Warren would stay at school until 4:00–4:30 and not take any work home.

93.     However, during the first nine weeks of the 2020-2021 school year, Warren would stay at school until 5:30-6:00 and would continue to work even after she went home. She would also work most weekends.

94.     Warren is a mother of two children and provides care for them.

95.     During the first nine weeks, Michaels's day included the following:

    a.  Teaching six in-person middle school math classes to On-Campus students;

    b.  Having one period for planning and meetings;

    c.  Creating assignments for On-Campus students;

    d.  Creating assignments for Virtual Students;

    e.  Teaching six middle school math virtual classes to Virtual Students;

    f.  Responding to messages and emails from virtual students and parents; and

    g.  Learning to use the Schoology platform.

96.     Michaels had approximately 101 total students. Approximately, 76 were On-Campus Students, and 25 were Virtual Students.

97.     In prior years, Michaels would leave school around 3:30 and work approximately 4 hours per week at home.

98.   However, during the first nine weeks of the 2020-2021 school year, Michaels would leave work around 4:00-4:30 and work an additional 20–30 hours a week at home.

99.   During the first nine weeks, Kennedy's day included the following:

    a.  Teaching five different subjects (reading, writing, math, science and social studies) to approximately 12-14 On-Campus Students every day of the school week;

    b.  Teaching five different subjects (reading, writing, math, science and social studies) to approximately 8-10 Virtual Students every day of the school week;

    c.  Planning during a single 30 minute planning period;

    d.  Creating assignments in five different subjects for On-Campus Students;

    e.  Creating assignments for five different subjects for Virtual Students;

    f.  Communicating with and answering questions from Virtual Students and their parents; and

    g.  Learning to use the Schoology platform.

100.  Kennedy had approximately 12 On-Campus Students and 10 Virtual Students.

101.   In prior years, Kennedy would typically arrive to school around 7:30, leave at 3:30, and only have minimal, if any, work to perform at home.

102.   In 2020-21, Kennedy would typically arrive to school around 7:30, leave at 4:30, and bring significant work at home, spending an extra 25-30 hours per week on school work.

103.   In sum, Johnson's plan for teaching Virtual Students required all of Plaintiffs to effectively teach additional classes and significantly increase their workload compared to previous years.

104.   Despite the additional demands and hours required of Plaintiffs during the first nine weeks, Defendants did not increase their compensation.

**After the First Nine Weeks of the 2020-2021 School Year**

105.   Starting in the second nine weeks of the 2020-2021 school year, on October 19, 2020, the Defendants implemented a new virtual learning platform called "Edgenuity."

106.   Edgenuity provided each Virtual Student with pre-uploaded content for each course and did not require any teacher involvement.

107.   Because Edgenuity provided learning materials and grades for students, teachers did not have to take on the responsibility for teaching Virtual Students enrolled in Edgenuity classes.

108.   Instead, Defendants had other employees—including teachers, librarians, and counselors—serve as "Remote Learning Coaches." They were largely responsible for monitoring attendance and acting as a point of contact for Virtual Students. The Remote Learning Coaches did not perform traditional teaching responsibilities for Edgenuity students.

109.   Upon a recommendation by Defendant Johnson and approval from the Board, TCSS paid these Remote Learning Coaches an additional stipend of approximately $5,500.

110.   However, Edgenuity did not offer all of the classes that certain schools offered. For example, Edgenuity did not offer many Advanced Placement classes, special education classes, vocational classes, foreign language classes, and more.

111.   Therefore, starting in the second nine weeks, certain teachers taught Virtual Students through Schoology for the classes that Edgenuity did not offer. Upon a recommendation by Defendant Johnson and approval from the Board, TCSS paid these teachers an additional stipend of $2,000 plus an additional $100 per student up to a maximum of $5,500 for teaching these virtual classes.

112.   Although Edgenuity was purportedly implemented to reduce the strain and stress on the teachers, even after the Defendants implemented Edgenuity, Plaintiffs and other teachers were still required to work substantially more hours than

what was set forth in Board Policy 6.11 and more than they had performed in past school years.

113.   Specifically, even after the first nine weeks, Plaintiffs and other teachers still had to use Schoology for the On-Campus Students who were quarantined for 10–14 days after contracting or being exposed to COVID or were otherwise absent.

114.   On-Campus Students who were quarantined could not use Edgenuity because it was teaching different materials at a different pace to Virtual Students. Therefore, Plaintiffs and other teachers taught the On-Campus students who were quarantined through Schoology.

115.   After the first nine weeks, there were On-Campus students in every class quarantined virtually all the time. Therefore, Plaintiffs and other teachers continued to face many of the same challenges that they experienced during the first nine weeks, and they still faced substantially increased workloads.

116.   The same obstacles that teachers faced with Schoology in the first nine weeks were present with the quarantined students, including:

      a.   Creating Schoology-specific materials;

      b.   Accounting for quarantined students taking tests or completing assignments at a different pace;

      c.   Answering questions from quarantined students;

    d.  Helping students with technological problems; and

    e.  Tutoring students who were behind.

117.  In fact, teaching quarantined students was more difficult in the sense that students began quarantine at different times, so all of the quarantined students were not on the same learning pace.

118.  Plaintiffs and the members of the Teachers Class had to devote significantly more time to their jobs to keep up with the demands of their normal in-person teaching of On-Campus Students and their teaching of quarantined students.

119.  Beasley, Michaels, Warren, and Kennedy estimate that she spent an additional 10–15 hours, if not more, per week teaching quarantined students.

120.  TCSS did not pay Plaintiffs and members of the Teachers Class any additional compensation for teaching what amounted to additional classes to quarantined students.

121.  TCSS, however, received over $30 million in funding from the federal government during the COVID-19 pandemic.

## TCSS Obligations, Rules, and Customs

122.  Historically, TCSS has paid teachers who taught additional classes during their planning period with additional compensation for these additional classes, in an amount equal to the pro-rata increase in the teaching duties (usually 1/7 more for a seven period work day).

123. Specifically, the Superintendent would recommend to the Board, and the Board would usually approve, additional pro-rata compensation for each additional class taught by those teachers who were teaching more than the usual number of classes.

124. Further, the Board has historically increased the credit towards a teacher's retirement benefits if the teacher taught more than a full load.

125. TCSS publishes a Policy Manual and a Salary Schedule that govern the terms of teachers' employment.

126. The Policy Manual contains the following policy:

The time set for the official opening and closing of the schools of the Tuscaloosa County School System are fifteen (15) minutes prior to the time students are to report to homeroom/first class and fifteen (15) minutes after the last class period each day. Between these times and throughout the school day, school personnel will be on duty and available to supervise care for students.

127. The Salary Schedule contains the following "Assumptions"

a. Employees performing equivalent tasks will receive equivalent remuneration.

b. All employees shall be paid in 12 equal monthly installments, regardless of the length of the contract (with the exception of new nine (9) month employees who shall be paid in 13 monthly installments)

128. Both the Policy Manual and the Salary Schedule provide that teachers are working for TCSS pursuant to contracts.

129.    Certain terms and conditions of Alabama public school teachers' employment, including the process for terminating teachers, are governed by the Students First Act, Ala. Code §§ 16-24C-1, *et seq.*

130.    The Students First Act requires the following procedures for termination of a tenured or nonprobationary teacher:

> The termination of a tenured teacher or nonprobationary classified employee . . . shall be initiated by the recommendation of the chief executive officer in the form of a written notice of proposed termination to the employee. . . . the notice shall state the reasons for the proposed termination, shall contain a short and plain statement of the facts showing that the termination is taken for one or more of the reasons listed in subsection (a), and shall be issued in conformity with subsection (k). The notice shall inform the employee . . . that, in order to request a hearing with the governing board, the employee must file a written request for such a hearing with the chief executive officer within 15 calendar days after issuance of the notice. Should the employee fail to timely file the request for hearing, the governing board shall vote on the recommended termination.

Ala. Code § 16-24c-6(b).

131.    The Students First Act requires the following procedures for termination of a probationary teacher:

> Probationary teachers . . . may be terminated at the discretion of the employer upon the written recommendation of the chief executive officer, a majority vote of the governing board, and issuance of written notice of termination to the teacher on or before the fifteenth day of June. In the first year of each legislative quadrennium, the written notice shall be provided on or before June 30.

Ala. Code § 16-24C-5(c).

132.    The Students First Act also provides:

Reductions in or modifications to employee compensation or benefits or of the length of the work or school year are not terminations or transfers for purposes of this chapter or otherwise subject to challenge or review under this chapter, provided that the action is all of the following:

    a. Prospective in effect.

    b. Based on the recommendation of the president of a two-year educational institution alone or the chief executive officer and formal approval of the governing board.

    c. Applied to similarly situated employees within the two-year college, agency, or system, or within designated operating divisions, departments, or employment classifications therein.

Ala. Code § 16-24C-6(h)(2).

133.   Both termination procedures require a recommendation of the chief executive officer (i.e., the superintendent) and a vote of the governing board.

134.   Johnson has not, at any point in time, recommended to the Board that Plaintiffs and members of the Teachers Class be required to (1) teach additional virtual classes on Schoology for Virtual Students during the first nine weeks without an increase in pay or (2) teach additional Schoology classes to quarantined students during the remainder of the 2020-2021 school year without an increase in pay. Because Johnson did not make such a recommendation, the Board obviously did not take a vote on the issue.

135.   In effect, the plan to require teachers to substantially increase their workload was a policy implemented solely by Johnson.

136.   By requiring Plaintiffs and members of the Teachers Class to teach additional classes on Schoology, Johnson effectively reduced their rate of compensation. Johnson substantially increased the workload of Plaintiffs and members of the Teachers Class by requiring to work substantially more hours and teach additional classes, yet their rate of compensation stayed the same.

137.   The Board and its individual members knew about the increased workload and yet it failed to take any of the required procedural actions to either approve or disapprove of Johnson's plan to increase teacher workload without commensurately increasing their compensation.

138.   Plaintiffs and members of the Teachers Class did not receive either a stipend or additional credit and contribution for their retirement plan.

139.   If Plaintiffs and members of the Teachers Class did not teach and/or refused to teach the additional instructional periods of Virtual classes and perform the additional work for the Virtual classes required by the Defendants, Plaintiffs and members of the Teachers Class would be subject to disciplinary action (up to and including termination), for charges including but not limited to, neglect of duty and insubordination.

140.   The Defendants would also have the power and duty to notify the Alabama State Department of Education ("ALSDE") regarding Plaintiffs' and the Teachers Class members' refusal to teach the additional Virtual classes and perform

the additional work, exposing Plaintiffs and other teachers to additional disciplinary action, including but not limited to revocation of their professional educator certificates.  Thus, Plaintiffs and other teachers had no choice but to do that which each was assigned, required and forced by the Defendants.

## CLASS ACTION ALLEGATIONS

141.   Plaintiffs repeat and reallege paragraphs 1–140 in this Complaint as if fully set forth herein.

142.   Plaintiffs bring this case as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek certification of this case as a class action on behalf of the following class of individuals:

> All teachers employed by the Tuscaloosa County Board of Education who are or have been required to teach Virtual Students and/or quarantined students using the on-line Schoology platform ("virtual classes") in addition to teaching the in-person classes they were hired to teach, without pay for said additional work, duties and hours, and without additional time, credit and/or contributions to TRSA (collectively referred to herein as the "Teachers Class").

143.   In addition to the Teachers Class, Plaintiffs seek to certify a subclass of the Teachers Class made up strictly of females to be defined as follows:

> All female teachers employed by the Tuscaloosa County Board of Education who are or have been required to teach Virtual Students and/or quarantined students using the on-line Schoology platform ("virtual classes") in addition to teaching the in-person classes they were hired to teach, without pay for said additional work, duties and hours, and

without additional time, credit and/or contributions to TRSA (collectively referred to herein as the "Female Teachers Subclass").

144.   Beasley and Kennedy are members of both the Teachers Class and the Female Teachers Subclass. Warren and Michaels are members of the Teachers Class, although Plaintiffs will seek leave to amend to add Warren and Michaels to the Female Teachers Subclass when Warren and Michaels receive their Right to Sue letters.

145.   Membership in the Teachers Class and in the Female Teachers Subclass is so numerous that separate joinder of each member is impracticable.  There are approximately 1,220 teachers employed by TCSS and the Board, and a majority are women.

146.   Plaintiffs reserve the right to redefine the class, as well as the class allegations and the scope of claims, following a reasonable opportunity for discovery and further investigation of the facts herein.

147.   There are numerous and substantial questions of law and fact common to the Teachers Class.  Included within the common questions are:

(a)   Whether Defendants can require the Teachers Class to teach virtual classes in addition to the in-person classes which Plaintiffs and the members of the Teachers Class were hired to teach;

(b)     Whether Defendants can refuse to compensate the Teachers Class for teaching the additional virtual classes;

(c)     Whether the Teachers Class can be assigned to teach the additional virtual classes without the Superintendent first recommending, and then the Board and Defendant members of the Board approving, said assignments;

(d)     Whether the Teachers Class can be assigned to teach the additional virtual classes without the Superintendent first recommending, and then the Board and Defendant members of the Board approving, compensation for the additional assignments;

(e)     Whether Defendants breached any contracts with the Teachers Class;

(f)     Whether Defendants denied the Teachers Class due process and just compensation;

(g)     Whether Defendants failed to comply with the Board's policies, including but not limited to the Salary Schedules, by:

    (i)     requiring the Teachers Class to teach the virtual classes without any compensation therefor;

(ii)   assigning the additional virtual classes to the Teachers Class without having the Superintendent first recommend the assignments to the Board, and then the Board and Defendant members of the Board approving said assignments;

(iii)   assigning the additional virtual classes to the members of the Teachers Class without having the Superintendent first recommend, and then the Board and Defendant individual members of the Board approve, that Teachers Class members receive compensation for teaching the virtual classes;

(iv)   assigning the additional virtual classes to the members of the Teachers Class without having the Superintendent first recommend, and then the Board and Defendant individual members of the Board approve, that Teachers Class members receive time, credit, and contributions to the TRSA for teaching the virtual classes;

(h)   Whether the Defendants violated the Students First Act by:

(i)   requiring the Teachers Class to teach the virtual classes; and/or

(ii)    not providing compensation therefor; and/or

(iii)   not first providing the members of the Teachers Class an opportunity for a hearing before the Board prior to requiring them to teach the Virtual classes;

(i)    Whether the Teachers Class is due to be paid by Defendants for the additional work that Defendants required the Teachers Class to perform;

(j)    Whether the Teachers Class is due to receive commensurate time, credit and contribution to TRSA by Defendants for the additional work that Defendants required the Teachers Class to perform;

(k)    Whether the Defendants acted willfully, fraudulently, maliciously, in bad faith, beyond their respective authority, and/or under a mistaken interpretation of the law in taking their actions in relation to the Teachers Class members in assigning and required the Teachers Class members to teach additional classes without the Superintendent recommending additional classes for each member of the Teachers Class without additional compensation, as well as additional time, credit and contribution to TRSA; without the Board approving the recommendations of

the Superintendent additional classes for each member of the Teachers Class without additional compensation as well as additional time, credit and contribution to TRSA.

(l)     Whether the Defendants' plan and actions towards the members of the Female Teachers Subclass, including but not limited to forcing the members of the Female Teachers Subclass to teach additional classes and perform significant additional work and duties without providing additional time during the workweek for performance thereof and thus requiring the Female Teachers Subclass members to do the required work in their off-time, all without any additional compensation, and then dismissing the Female Teachers Subclass members' concerns about the additional work, teaching duties and classes as "whiny females," had an illegal and discriminatory disparate impact on the Female Teachers Subclass members;

148.   Plaintiffs' claims are typical of the members of the Teachers Class and of the Female Teachers Subclass.

149.    Plaintiffs will fairly and adequately represent and protect the interests of the Teachers Class and of the Female Teachers Subclass.  Plaintiffs have retained counsel experienced and competent in prosecution of class actions, complex

litigation, and claims of the type and nature asserted on behalf of the Teachers Class and the Female Teachers Subclass.

150.   Plaintiffs have no interests that are adverse to the interests of the Teachers Class or the Female Teachers Subclass.

151.   A class action is superior to other available methods for the fair and efficient adjudication of claims asserted herein. Because the damages suffered by individual class members and the relief to which each individual class member may be entitled could, in some cases, be relatively small, the expense and burden of individual litigation makes it virtually impossible (and certainly impracticable) for the class members to attempt to separately redress the wrongs committed by Defendants, both named and (presently) fictitious.

152.   This action qualifies for certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the members of the Teachers Class and of the Female Teachers Subclass predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

153.   Absent a class action, members of the Teachers Class and of the Female Teachers Subclass will continue to suffer damage, and the wrongful conduct and violations of law by Defendants will proceed without remedy while Defendants

continue to reap the benefits of its actions to the detriment of Plaintiffs, Teachers Class members, and Female Teachers Subclass members.

154.   Most individual members of the Teachers Class and the Female Teachers Subclass have little ability to prosecute an individual action due to the comparatively small, although significant, actual damages suffered by the class members individually and the significant cost associated with litigation against Defendants.

155.   This action will result in an orderly and expeditious administration of class claims.  Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

156.   This action presents no difficulty that would impede its management by the Court as a class action, and a class is superior to other available methods for the fair and efficient adjudication of the claims.

**COUNT 1[2]**
**42 U.S.C. §1983**

157.   Plaintiffs incorporate by reference the allegations in paragraphs 1–156.

158.   As public employees in the state of Alabama, Plaintiffs have a protected property right in their employment with TCSS and in certain terms of their employment.

---

[2] Plaintiffs allege Count 1 against Johnson and against each of the Board Members—all in their individual capacities.

159.   Plaintiffs have a property right in their continued employment.

160.   Plaintiffs have a right to certain procedures that the Students First Act makes terms of their employment. In other words, the Students First Act defines Plaintiffs' property rights in their continued employment within the context of the procedures to terminate them or change certain conditions of their employment. These procedures are therefore a part of Plaintiffs' property rights in their employment.

161.   Plaintiffs also have a property right "in the whole" of their employment. *Ledbetter v. Jackson Cty. Bd. Of Educ.*, 508 So. 2d 244, 246 (Ala. 1987). The whole of their employment includes their rate of compensation and the hours they are obligated to work.

162.   While Plaintiffs' statuses as either tenured or nonprobationary employees do not, in and of themselves, create a property right in their rates of compensation or hours worked, Alabama law provides that the very nature of a property right in employment inheres a property right in the whole of that employment.

163.   Further, TCSS created certain rules and understandings with its Policy Manual, Salary Schedule, and historical practices.

164.   In particular, TCSS created the following rules and understandings:

    f.  Employees performing equivalent tasks will receive equivalent remuneration;

    g.  Teachers work on nine-month contracts; and

    h.  Certified teaching personnel are generally required to be on duty 15 minutes before the time set for the opening of their respective school and 15 minutes after the close of the school day, Monday through Friday, and the necessary time to transact faculty meetings, school business, and safe orderly dismissal of students, etc.

165.  Johnson, as the Superintendent of TCSS, took the following actions that affected Plaintiffs' property rights in their employment:

    a.  For the first nine weeks of the 2020-2021 academic year, Johnson forced Plaintiffs to teach online classes using the Schoology platform to students who were on the virtual, as opposed to in-person, attendance track in addition to their normal, full-time in-person teaching load, without providing additional compensation, and

    b.  After the first 9 weeks of the 2020-2021 academic year, Johnson forced Plaintiffs to teach quarantined or absent students through the Schoology online platform in addition to their otherwise full-time teaching load, without providing additional compensation.

166.  Both of these actions by Johnson substantially increased Plaintiffs' workload, increased the number of classes with their own particular requirements that Plaintiffs had to teach, and substantially increased the number of hours that Plaintiffs had to work and teach.

167.  Despite this increase in workload, TCSS did not provide additional compensation to Plaintiffs. Specifically, Johnson did not seek approval for either commensurately increasing teacher pay or keeping teacher pay the same. As a result, Plaintiffs suffered partial terminations and a decrease in their rates of compensation because TCSS, as a result of Johnson's actions and omissions, required Plaintiffs to increase their workload significantly while receiving the same rate of compensation.

168.  For the last three nine weeks of the 2020-2021 school year, teachers who taught quarantined students effectively had additional virtual classes to teach, yet they were not compensated in an equivalent manner to teachers who taught classes devoted to full-time virtual students.

169.  Johnson failed to follow the proper termination procedures for reducing Plaintiffs' rate of compensation.

170.  The individual board members—Orr, Jones, Calvin, Squires, Smalley, Lake, and Presley—knew about the substantial increase in the workload for teachers, yet they did not vote to either approve or disapprove Johnson's plan. Either by conscious decision or omission, they allowed Johnson to unilaterally create a plan

Case 7:21-cv-00890-LSC   Document 13   Filed 09/13/21   Page 41 of 61

that effectively reduced the rate of compensation for Plaintiffs and the members of the Teachers Class and effect a partial termination.

171. The Students First Act requires the following procedures for termination of a tenured or nonprobationary teacher:

> The termination of a tenured teacher or nonprobationary classified employee . . . shall be initiated by the recommendation of the chief executive officer in the form of a written notice of proposed termination to the employee. . . . the notice shall state the reasons for the proposed termination, shall contain a short and plain statement of the facts showing that the termination is taken for one or more of the reasons listed in subsection (a), and shall be issued in conformity with subsection (k). The notice shall inform the employee . . . that, in order to request a hearing with the governing board, the employee must file a written request for such a hearing with the chief executive officer within 15 calendar days after issuance of the notice. Should the employee fail to timely file the request for hearing, the governing board shall vote on the recommended termination.

Ala. Code § 16-24c-6(b).

172. The Students First Act requires the following procedures for termination of a probationary teacher:

> Probationary teachers . . . may be terminated at the discretion of the employer upon the written recommendation of the chief executive officer, a majority vote of the governing board, and issuance of written notice of termination to the teacher on or before the fifteenth day of June. In the first year of each legislative quadrennium, the written notice shall be provided on or before June 30.

Ala. Code § 16-24C-5(c).

173. Both termination procedures require a recommendation of the chief executive officer and a vote of the governing board, and here, Johnson did not make

Page 41 of 61

a recommendation and the Board did not vote to effectively reduce Plaintiffs' rate of compensation by requiring them to teach additional classes and devote substantially more hours to their job without an increase in pay.

174. As a result, TCSS, by virtue of Johnson's individual actions and the inaction of the Board Members, did not afford Plaintiffs constitutionally adequate procedures.

175. The Students First Act also provides:

Reductions in or modifications to employee compensation or benefits or of the length of the work or school year are not terminations or transfers for purposes of this chapter or otherwise subject to challenge or review under this chapter, provided that the action is all of the following:
a. Prospective in effect.
b. Based on the recommendation of the president of a two-year educational institution alone or the chief executive officer **and formal approval of the governing board**.
c. Applied to similarly situated employees within the two-year college, agency, or system, or within designated operating divisions, departments, or employment classifications therein.

Ala. Code § 16-24C-6(h)(2) (emphasis added).

176. Because the Board did not approve the effective reduction in the rate of Plaintiffs' compensation, it served as a partial termination and does not fall within the scope of Ala. Code § 16-24C-6(h)(2).

177. By failing to follow the proper procedures and partially terminating Plaintiffs without a vote of the governing board, Johnson and the Board Members

violated Plaintiffs' procedural due process rights in relation to the following protected property interests:

    a.  Plaintiffs' right to the *whole* of their employment, including their rates of compensation compared to the number of hours worked for a traditional school day;

    b.  Plaintiffs' right to have the terms of their employment modified according to the procedures outlined in the Students First Act; and

    c.  Plaintiffs' right to have their employment governed by rules and understandings created by TCSS in its Policy Manual and Salary Schedule.

178.   The right to have a termination voted upon by the governing board is a clearly established right. The Students First Act plainly and unambiguously provides that right, and it also plainly provides that a reduction in compensation is not a termination only when it is voted upon by the governing board.

179.   The Students First Act provides constitutionally adequate procedures that TCSS must follow. These procedures provide obvious clarity to TCSS for what it must do to provide adequate process. Those procedures were not followed here.

180.   Moreover, the specific contours of Plaintiffs' protected property interest are clearly established because they are expressly stated in the Students First Act, the TCSS Policy Manual, and the TCSS Salary Schedule.

181.   Because Johnson failed to present and the Board failed to vote to partially terminate Plaintiffs, the normal administrative remedies available under the Students First Act were not available to Plaintiffs.

182.   The Students First Act provides an avenue to appeal decisions by the governing board, both when the board allows an employee a hearing and when the board denies a hearing. *See* Ala. Code §§ 12-24C-6(e), 12-24C-8. However, the appeal provisions are premised on the governing board actually making a decision.

183.   The Students First Act does not provide a procedure to appeal the *lack* of a decision or the failure of the governing board to make a decision.

184.   In other words, the normal appeal procedures were unavailable to Plaintiffs, so they had no administrative remedies to pursue or exhaust.

185.   As a result of Johnson and the Board Members' actions, Plaintiffs suffered partial terminations without the benefit of receiving constitutionally adequate procedures.

186.   Further, Plaintiffs suffered damages because they did not receive financial compensation commensurate with their additional workload and in accordance with the rules and understandings of their employment. Plaintiffs are thus entitled to backpay, among other damages and remedies.

**WHEREFORE,** Plaintiffs, individually and on behalf of the members of the Teachers Class, seek compensatory damages, including back pay, special damages,

including emotional distress damages, punitive damages, attorney's fees pursuant to

42 U.S.C. § 1988, and any other relief deemed proper by the Court.

**COUNT 2[3]**
**BREACH OF CONTRACT**

187.   Plaintiffs incorporate by reference the allegations in paragraphs 1–156.

188.   TCSS/the Board and Plaintiffs entered into contracts for the

employment of Plaintiffs by TCSS.

189.   TCSS's salary schedule provides the following "Assumptions" that

apply to its employees:

  a. "All employees shall be paid in 12 equal monthly installments,

     regardless of the length of the **contract** (with the exception of new

     nine (9) month employees who shall be paid in 13 monthly

     installments)."

  b. "Twelve month **contracts** run July 1 through June 30."

  c. "If position **contracts** extend beyond the stated number of days,

     salaries and/or ranges will be paid at the daily rate."

  d. "If a position **contracted** is for work of less than the regular daily

     hours for that employee type, calculate salary using the hourly rate

---

[3] Plaintiffs allege Count 2 against TCSS and the Board. However, to the extent that Johnson or the Board Members are proper defendants for requiring TCSS and the Board to perform their legal duties, then Count 2 is likewise alleged against Johnson and the Board Members.

x days **contracted** to work = Annual Pay. The hourly rate is calculated as follows: Annual Pay/days **contracted** to work = Daily Pay; Daily Pay/daily hours = Hourly Rate."

190.   Further, the Salary Schedule provides the following chart:

## TEACHERS
### (*187 DAY CONTRACT)

| | BACHELOR'S DEGREE – (Class B) | | | | | | MASTER'S DEGREE – (Class A) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EXP | SEPT DAILY RATE | OCT-AUG DAILY RATE | 2020 SEPT MONTHLY | 2020-2021 OCT-AUG MONTHLY | 2020-2021 CONTRACT | EXP | SEPT DAILY RATE | OCT-AUG DAILY RATE | 2020 SEPT MONTHLY | 2020-2021 OCT-AUG MONTHLY | 2020-2021 CONTRACT |
| 0 | 218.57 | 218.57 | 3,406.06 | 3,406.06 | 40,872.73 | 0 | 251.35 | 251.35 | 3,916.83 | 3,916.83 | 47,001.90 |
| 1 | 218.57 | 218.57 | 3,406.06 | 3,406.06 | 40,872.73 | 1 | 251.35 | 251.35 | 3,916.83 | 3,916.83 | 47,001.90 |
| 2 | 218.57 | 218.57 | 3,406.06 | 3,406.06 | 40,872.73 | 2 | 251.35 | 251.35 | 3,916.83 | 3,916.83 | 47,001.90 |
| 3 | 240.42 | 240.42 | 3,746.56 | 3,746.56 | 44,958.76 | 3 | 276.48 | 276.48 | 4,308.45 | 4,308.45 | 51,701.43 |
| 4 | 240.42 | 240.42 | 3,746.56 | 3,746.56 | 44,958.76 | 4 | 276.48 | 276.48 | 4,308.45 | 4,308.45 | 51,701.43 |
| 5 | 241.36 | 241.36 | 3,761.26 | 3,761.26 | 45,135.16 | 5 | 276.60 | 276.60 | 4,310.33 | 4,310.33 | 51,723.94 |
| 6 | 250.95 | 250.95 | 3,910.60 | 3,910.60 | 46,927.20 | 6 | 288.58 | 288.58 | 4,497.01 | 4,497.01 | 53,964.08 |

191.   The asterisk before "187 day contract" refers to the following: "The pay period for the **contract** year runs from September 2020 through August 2021."

192.   The TCSS Policy Manual states:

a.   "If a teacher has attained tenured status, his/her **contract** may be terminated because of elimination of the position to which the teacher was appointed if no other position exists to which the certified employee may be appointed if certified and qualified."

b. "An employee who violates the terms of an **employment agreement or written contract** by leaving his/her position without first being released from the agreement or contract by the Tuscaloosa County Board of Education and fails to complete and file the required records and reports, may have final compensation withheld."

193. Therefore, according to the TCSS Salary Schedule and Policy Manual, TCSS has a contractual relationship with its teachers.

194. Further, at the end of each school year, teachers sign documents indicating that they intend to teach in the next school year. These documents constitute an offer of employment from TCSS and the Board to the teachers.

195. Under the Students First Act, teachers cannot terminate their employment within 30 calendar days before the first day of the next school term or, at any time, without giving 30 days' notice. *See* Ala. Code § 16-24C-11. If a teacher violates this requirement, she will be "guilty of unprofessional conduct" and may have her teaching certificate suspended or revoked. *Id.*

196. As a result, a teachers' employment is not purely at will.

197. Through the Salary Schedule and the Policy Manual, TCSS/the Board made the following terms a part of their employment contracts with teachers:

a. Employees performing equivalent tasks will receive equivalent remuneration;

b. Teachers work on nine-month contracts; and

c. Certified teaching personnel are generally required to be on duty 15 minutes before the time set for the opening of their respective school and 15 minutes after the close of the school day, Monday through Friday, and the necessary time to transact faculty meetings, school business, and safe orderly dismissal of students, etc.

198.   The Salary Schedule, as shown in the excerpt above, also establishes certain daily rates of compensation.

199.   TCSS/the Board breached its contract with Plaintiffs in the following ways:

a. TCSS/the Board failed to provide equivalent renumeration for equivalent tasks when it failed to compensate teachers for teaching quarantined students remotely while it compensated teachers for teaching standalone remote classes and monitoring Edgenuity classes;

b. TCSS/the Board substantially lengthened the contractual workday by requiring teachers in the first nine weeks to teach virtual classes in addition to their normal in-person classes;

    c. TCSS/the Board substantially lengthened the workday by requiring teachers in the last three nine weeks to teach virtual classes to quarantined students in addition to their normal in-person classes; and

    d. TCSS/the Board effectively lowered the daily rate of compensation by substantially increasing the number of hours that teachers were required to work—well beyond the typical workday established in the Salary Schedule—without providing commensurate compensation.

200.  TCSS, along with the Board Members and the Board itself, had a legal obligation to abide by the terms of the contracts entered into with Plaintiffs and members of the Teachers Class.

201.  TCSS/the Board actually accepted the benefits of the contracts that it had with Plaintiffs because Plaintiffs actually completed the work required of them.

202.  As a result, TCSS and the Board are not immune from suit to enforce their legal contractual obligations related to teaching services that Plaintiffs and members of the Teachers Class actually performed and that TCSS and the Board actually accepted.

203.    TCSS/the Board's breaches of their contracts with Plaintiffs caused Plaintiffs to suffer damages because they provided additional services to TCSS/the Board without compensation.

**WHEREFORE** Plaintiffs, individually and on behalf of the members of the Teachers Class, seek compensatory damages and all other relief necessary to enforce their contractual rights.

## COUNT 3[4]
## Quantum Meruit

204.    Plaintiffs incorporate by reference the allegations in paragraphs 1–156.

205.    Plaintiffs plead this claim in the alternative to their breach of contract claim.

206.    Plaintiffs provided services to TCSS/the Board by teaching (1) online classes to students who were on a "virtual" (as opposed to in-person) track in addition to their normal teaching loads during the first nine weeks of the 2020-2021 school year and (2) online classes to quarantined or absent students in addition to their normal teaching loads during the last 3 nine weeks of the 2020-2021 school year.

---

[4] Plaintiffs allege Count 3 against TCSS and the Board. However, to the extent that Johnson or the Board Members are proper defendants for requiring TCSS and the Board to perform their legal duties, then Count 3 is likewise alleged against Johnson and the Board Members.

207. This additional work was over and above the work that Plaintiffs typically performed as part of their roles as a teacher.

208. TCSS/the Board knowingly accepted Plaintiffs' services because it, in fact, required Plaintiffs to provide those services.

209. Further, TCSS/the Board knowingly accepted Plaintiffs' services because Plaintiffs actually rendered the services and TCSS/the Board received the benefit of those services.

210. TCSS/the Board did not pay the reasonable value of Plaintiffs' services because it failed to provide any additional compensation for the substantial increase in work and effort provided by Plaintiffs.

211. By contrast, TCSS/the Board paid certain teachers an additional stipend starting in the second nine weeks of the 2020-2021 school year for teaching standalone remote classes on Schoology and for being monitors for Edgenuity remote classes.

212. TCSS/the Board also provided—and has long provided—teachers with a stipend for performing additional work, including for extra-curricular functions. For example, TCSS provided and still provides additional compensation for coaching athletic teams, taking tickets to athletic and other events, cutting grass on the athletic fields, participating in the "Extended Day" program, directing the band, and leading certain clubs. Teachers who taught additional class periods also received

a pro-rata portion of their salaries (i.e., 1/6 or 1/7) for each additional class period taught.

213.   Based on the additional compensation for these classes and obligations, Plaintiffs reasonably expected to receive and based on the historical practice and course of conduct of TCSS/the Board should have received additional compensation for teaching online classes in addition to the regular in-person classes during the first nine weeks and online classes to quarantined students in addition to the regular in-person classes during the last three nine weeks of the school year.

214.   Plaintiffs' expectations are also based on the Salary Schedule's statement that "Employees performing equivalent tasks will receive equivalent remuneration" and on the Board Policy which provides that "[c]ertified teaching personnel are generally required to be on duty 15 minutes before the time set for the opening of their respective school and 15 minutes after the close of the school day."

215.   Because (1) Plaintiffs provided services to TCSS/the Board, (2) TCSS/the Board accepted and enjoyed the benefit of those services, and (3) Plaintiffs had a reasonable expectation of payment, TCSS/the Board and Plaintiffs had an implied agreement that TCSS/the Board would reasonably compensate Plaintiffs for their services. TCSS/the Board failed to reasonably compensate Plaintiffs.

216.   TCSS, the Board, and the Board Members had a legal obligation to abide by the implied contracts that it had with Plaintiffs and members of the Teachers Class.

217.   Therefore, Plaintiffs are entitled to compensation from TCSS/the Board commensurate with the amount of time expended and value conferred on TCSS/the Board by having performed the additional on-line teaching to virtual and quarantined students.

**WHEREFORE,** Plaintiffs, individually and on behalf of the members of the Teachers Class, seek compensatory damages and all other relief necessary to enforce their implied contractual rights.

### COUNT 4[5]
### Violation of Title VII of the Civil Rights Act of 1964
### (42 U.S.C. §§ 2000e *et al*.)

218.   Beasley and Kennedy incorporate by reference the allegations in paragraphs 1–156.[6]

219.   Beasley has been a teacher for TCSS for thirty-two years, and Kennedy has been a teacher for TCSS for seven years.

---

[5] Count 4 is alleged against TCSS and the Board.

[6] Warren and Michaels have not received Right to Sue letters. As currently pled, this count only applies to Michelle Beasley and Rebecca Kennedy, who have received their Right to Sue letters. Plaintiffs will seek leave to amend this Complaint to include Warren and Michaels as parties to this claim when they receive their Right to Sue letters.

220.   Plaintiffs are female teachers who taught in the TCSS during the 2020-2021 school year.  They are members of the Female Teachers Subclass, and they are caregivers to either their children or their elderly parents.

221.   The majority of the teachers in TCSS are female, and they are the primary caregivers for their families, households, and parents.

222.   Women "tak[e] on most of the household and familial duties," including childcare, and "women are also much more likely to be the ones who care for sick or elderly family members."  Maggie Germano, *Women are Working More Than Ever, But They Still Take On Most Household Responsibilities*, Forbes (March 27, 2019), https://www.forbes.com/sites/maggiegermano/2019/03/27/women-are-working-more-than-ever-but-they-still-take-on-most-household-responsibilities

223.   "Women are eight times more likely than men to look after sick children or manage their children's schedules."  Id.

224.   In addition, "[t]wo out of every three caregivers in the United States are women. *Women, Caregiving, and COVID-19*, Centers for Disease Control, June 21, 2021, https://www.cdc.gov/women/caregivers-covid-19/index.html

225.   Beasley and Kennedy are female.

226.   Beasley, Kennedy, and the members of the Female Teachers Subclass were hired by TCSS and the Board to teach a full school day, which according to the Board's Policy 6.11, the school day for teachers in the TCSS begins fifteen minutes

prior to the beginning of the instructional day at each teacher's assigned school and ends fifteen minutes after the end of the instructional day at that school.

227.   Historically, high school teachers, including Beasley, taught students during six (6) class periods each day, and have one (1) preparatory period and a lunch during one of the periods, for a total of seven (7) periods.

228.   Historically, Elementary school teachers, like Kennedy, taught the same class of students five subjects every day, and they have one planning period and one lunch period.

229.   However, the TCSS, the Board, and Defendants Johnson, Orr, Jones, Calvin, Squires, Smalley, Lake, and Presley, in violation of the Board's policies, Alabama law and federal law, have wrongfully, willfully, fraudulently, maliciously, in bad faith, beyond their respective authority, and/or under a mistaken interpretation of the law, required Beasley, Kennedy, and the members of the Female Teachers Subclass to teach a full day of instruction in person to the On-Campus Students at their assigned schools, and then to also teach multiple additional periods of instruction to Virtual Students.

230.   TCSS and the Board did not provide Beasley, Kennedy, or the members of the Female Teachers Subclass with additional or any compensation for the additional teaching duties, instructional hours, work and planning, except for those Female Teachers Subclass members who teach classes for which Edgenuity does not

have pre-programmed classes (such as advanced placement classes, special education classes, vocational education classes, foreign language classes, physical education classes, and other elective classes) and whom the Defendants are now paying some pro rata compensation.

231.   TCSS and the Board have not provided Beasley, Kennedy, or the members of the Female Teachers Subclass with additional time during the school day or school week to perform the additional teaching duties, instructional hours, work and planning.

232.   In order to meet the demands of teaching both the On-Campus Students and the Virtual Students, Beasley, Kennedy, and members of the Female Teachers Subclass have had to spend their afternoons, evenings and weekends handling their new virtual teaching duties, including but not limited to preparing teaching materials, uploading lessons, preparing tests and quizzes, and responding to multiple emails, text messages and phone calls from Virtual Students and their parents.  This was in addition to and after teaching a full load of On-Campus classes each day.

233.   This additional work and hours spent preparing, teaching and grading virtual classes were extremely stressful and exhausting and interfered with the Beasley, Kennedy, and Female Teachers Subclass members' duties as family and household caregivers, as well as negatively impacting their mental, physical and

emotional health, and depriving them of time with their families and needed downtime.

234.   The action, omissions, requirements and policies of the TCSS and the Board in relation to the 2020-2021 academic year, have created a disparate negative impact on Beasley, Kennedy, and Female Teachers Subclass members.

235.   TCSS and the Board discriminated against Beasley, Kennedy, and the members of the Female Teachers Subclass on the basis of sex in the terms and conditions of their employment in violation of Title VII of the Civil Rights Act of 1964, as amended.

236.   As a consequence of the unlawful conduct of TCSS and the Board, Beasley, Kennedy, and the members of the Female Teachers Subclass have suffered damages, including but not limited to lost wages, benefits, mental distress and emotional pain and anguish.

237.   Beasley, Kennedy, and the Female Teachers Subclass members have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for compensatory damages, punitive damages, attorneys' fees, costs, injunctive relief and declaratory judgment is their only means of securing adequate relief.

238.   Beasley, Kennedy, and the Female Teachers Subclass members are now suffering and will continue to suffer irreparable injury from the actions of the

TCSS and the Board, which were taken wrongfully, willfully, fraudulently, maliciously, in bad faith, beyond their respective authority, and/or under a mistaken interpretation of the law.

**WHEREFORE** Beasley and Kennedy, individually and on behalf of the members of the Female Teachers Subclass, seek compensatory damages, including backpay, reinstatement to their prior positions, front pay, attorney's fees and expenses, punitive damages, special damages, including emotional distress damages, and all other relief deemed proper by the Court.

<u>**RELIEF REQUESTED**</u>

Plaintiffs respectfully requests that the Court:

A.     Enter an Order certifying this action to proceed as a class action and naming Plaintiffs as the representatives of the Teachers Class and the Female Teachers Subclass and their counsel as counsel for the Teachers Class and the Female Teachers Subclass;

B.     Enter an Order declaring the Defendants to be financially responsible for providing court-approved notice regarding this class action to the Teachers Class and the Female Teachers Subclass;

C.     Enter a judgment in favor of Plaintiffs and members of the Teachers Class and Female Teachers Subclass awarding them the relief requested on the claims as alleged above;

D.      Enter an Order awarding Plaintiffs attorneys' fees and costs, as allowed by law;

E.      Enter an award of pre-judgment and post-judgment interest, as provided by law; and

F.      Grant Plaintiffs, the Teachers Class, and the Female Teachers Subclass such other, further or additional relief, general or special, as the Court may deem just and proper under the circumstances and applicable law.

## JURY DEMAND

**PLAINTIFFS, INDIVIDUALLY AND ON BEHALF OF THE TEACHERS CLASS MEMBERS AND FEMALE TEACHERS SUBCLASS MEMBERS, DEMAND A TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted this the 13th day of September, 2021.


_/s/ Brannon J. Buck_
Brannon J. Buck  (ASB-5848-K56B)
bbuck@badhambuck.com
Christopher B. Driver (ASB-9178-G39B)
cdriver@badhambuck.com
_Counsel for Plaintiffs_

**Of Counsel:**
**BADHAM AND BUCK, LLC**
200I Park Place North
Suite 500
Birmingham, Alabama 35203
Telephone: (205) 521-0036

*/s/ Ruth B. McFarland*
Ruth B. McFarland (ASB-7051-E58R)
ruth@winmclaw.com
*Counsel for Plaintiffs*

*/s/ Bryan P. Winter*
Bryan P. Winter (ASB-3369-I63B)
bwinter@winmclaw.com
*Counsel for Plaintiffs*

**Of Counsel:**
**WINTER MCFARLAND, LLC**
205 McFarland Circle North
Tuscaloosa, Alabama 35406
Telephone: (205) 650-1400
Facsimile: (205) 650-1401

*/s/ Heather Leonard*
Heather Leonard (ASB-1152-061H)
Heather@heatherleonardpc.com
*Counsel for Plaintiffs*

**Of Counsel:**
**HEATHER LEONARD PC**
2105 Devereux CIrcle
Vestavia Hills, AL 35243
Telephone: (205) 977-5421

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document has been filed electronically on this the 13th day of September, 2021.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by United States Mail, facsimile, or hand delivery.  Parties may also access this filing through the Court's electronic filing system.

Ray Ward
Thomas W. Powe, Jr.
RAYMOND E. WARD, L.L.C.
2216 14th Street (35401)
Post Office Box 1248
Tuscaloosa, Alabama 35403
Telephone: (205) 345-5564
Facsimile: (205) 345-5582
rayward@raywardlaw.com
kippowe@raywardlaw.com

Mark S. Boardman
Clay R. Carr
BOARDMAN, CARR, PETELOS,
WATKINS & OGLE, P.C.
400 Boardman Drive
Chelsea, Alabama 35043
Telephone: (205) 678-8000
Facsimile: (205) 648-0000
mboardman@boardmancarr.com
ccarr@boardmancarr.com

          */s/ Brannon Buck*         
          OF COUNSEL